UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re:

RICHARD K. MILLER,

　　　　Debtor.

_____/

Case No. GM 09-90569
Chapter 13

OPINION REGARDING VENUE OF
CHAPTER 13 CASE

Appearances:

Robert D. Heikkinen, Esq., Marquette, Michigan, attorney for Richard K. Miller.

Gregory Siebold, Esq., Iron Mountain, Michigan and Frederick C. Wieting, Esq.,
Green Bay, Wisconsin, attorneys for State Bank of Florence.

## I. ISSUE.

Richard K. Miller ("Debtor") filed his chapter 13 bankruptcy case on August 3, 2009. The State Bank of Florence ("Bank") timely filed its Motion for Dismissal ("Motion") asserting that the Debtor's case is improperly venued. The only issue is whether this bankruptcy case was filed in the proper district or not.

## II. PROCEDURAL BACKGROUND.

The court held an evidentiary hearing on February 10, 2010 at which twenty-nine (29) exhibits were admitted into evidence (Exh. 1-16 for the Bank; Exh. A-M for the Debtor). The parties agreed that the court also should take judicial notice of the Debtor's Schedules and Statement of Affairs. The court

heard testimony from two witnesses:   the Debtor and Clyde Nelson, Vice President of the Bank.  The court found both witnesses were very credible.

### III.  JURISDICTION AND STANDING.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334(a). This contested matter is a core proceeding.  28 U.S.C. § 157(b)(2)(A) (estate administration).  This court is empowered to hear and decide the Motion.  28 U.S.C. § 157(a); L.R. 83.2(a) (W.D. Mich.).  This opinion states the court's findings of fact and conclusions of law.  FED. R. BANKR. P. 7052.

Although not specifically raised by the parties, the court has considered whether the Bank has standing to bring its Motion.  The Debtor asserts that the Bank is not owed *any* debt.  The Bank asserts a debt exists.  The meaning of "debt" and the meaning of "claim" are coextensive.  *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 558, 110 S. Ct. 2126, 2130 (1990); *accord Glance v. Carroll (In re Glance)*, 487 F.3d 317, 320 (6th Cir. 2007) (when a creditor holds a "claim" against a debtor, that debtor owes a "debt" to the creditor).  A "claim" includes a "right to payment" even if "disputed."  11 U.S.C. § 101(5)(A).  Because the Bank's disputed debt constitutes a "claim," the Bank has standing to pursue its Motion until such time, if ever, when a final determination is made that the Bank has no claim.

### IV.  FACTS.

The Debtor was born on November 13, 1955 in Iron Mountain, Michigan and was raised in the home of his parents ("Moon Lake Property").  The Debtor's

2

father was a plumber with a small business in Iron Mountain. (Trial Transcript, hereinafter "Trans.," at 99-100; Exh. 7 at 4, 80-81, 131).

Iron Mountain is a small Michigan city located across the border from Wisconsin. The Debtor's family has lived in the area for several generations and owned real property, both in Michigan and Wisconsin. (Trans. at 74; Exh. 7 at 13, 17).

Following high school, the Debtor, who had been employed in his father's plumbing business, became a union certified journeyman plumber and pipefitter working out of the Upper Peninsula of Michigan Plumbers and Pipefitters Union No. 111. (Exh. 7 at 5-7).

In 1982, the Debtor's father died. The Debtor inherited the following real property: (1) a two-third interest in the family cottage ("Wisconsin Cottage") located on a lake in Wisconsin approximately seven miles from Iron Mountain, Michigan; and (2) a one-half interest in three adjacent parcels of undeveloped property in Michigan approximately two miles from Iron Mountain ("3 - 40 Acre Parcels"). (Trans. at 62, 74-75, 80; Exh. 7 at 12-18). The other one-third of the Wisconsin Cottage was owned by the Debtor's uncle and aunt. The remaining one-half interest in the 3 - 40 Acre Parcels was owned by the Debtor's aunt and her children. Both the Wisconsin Cottage and the 3 - 40 Acre Parcels had been in the Debtor's family for approximately four generations. (Trans. at 74-75, 80; Exh. 7 at 12-13, 17).

In approximately 1984, the Debtor purchased the interest of his uncle and aunt in the Wisconsin Cottage. At the approximately the same time, he also

bought the interest of his aunt and her children in the 3 - 40 Acre Parcels. (Trans. at 81-82; Exh. 7 at 13-18).

In approximately 1990, the Debtor bought an additional 40 acre parcel, adjoining and south of the 3 - 40 Acre Parcels. During the 1990s, he improved this parcel by constructing a small cabin and outhouse ("Cabin Property"). (Trans. at 81; Exh. 7 at 19).

In approximately 2002, the Debtor's mother died. The Debtor inherited the Moon Lake Property. (Trans. at 98; Exh. 7 at 81).

By 2002, the Debtor's marriage had ended in divorce at a time when he had one minor child. (Exh. 7 at 20). Apparently concerned about providing for that child in the event of the Debtor's death, on May 1, 2002, the Debtor created the Richard K. Miller Revocable Trust of May 1, 2002 ("Trust"). (Exh. 2; Trans. at 99). The Trust was terminable by the Debtor at any time. The Debtor was the sole beneficiary during his lifetime, unless and until he was declared incompetent.

In addition to being the Trust settlor and sole initial beneficiary, the Debtor was also the sole initial Trustee. The Trust was executed by the Debtor in Michigan. The Trust states that it is to be construed, regulated and administered "in all respects in accordance with the laws of the State of Michigan." (Exh. 2, Article XV, "Trust Situs.")

Initially, the Debtor did not fund the Trust. However, on September 23, 2003, the Debtor executed three deeds in Michigan quit-claiming to the Trust the Moon Lake Property, the 3 - 40 Acre Parcels, the Cabin Property, and the

4

Wisconsin Cottage. (Exh. E; Exh. 1A and 1B). These deeds were never recorded. (Trans. at 45).

In 2006, the Debtor developed a serious heart condition which required the implantation of a pacemaker. The illness and the operation resulted in the Debtor being unable to work for a significant portion of 2006. After this medical procedure, the Debtor was unable to work near certain welding equipment and he could no longer be employed as a journeyman plumber and pipefitter. (Exh. 7 at 9-11). Also in 2006, the Debtor began borrowing funds from the Bank, apparently for living and on-going medical expenses. He borrowed $221,444.28 from the Bank in October, 2006 and $400,000 in January, 2007. (Exh. 4 & 8). To secure the Bank's loan, the Debtor granted mortgages on the Wisconsin Cottage, the Moon Lake Property, and the 3 - 40 Acre Parcels, but *not* the Cabin Property. (Exh. 11 & 12). The Debtor did not advise the Bank of the existence of the Trust; he granted the mortgages in his individual name. (Exh. 8, 9 & 10). The mortgages were recorded in both Michigan and Wisconsin. (Exh. 11 & 12).

In 2007, the Debtor became employed at the Iron County Medical Care Facility in Iron Mountain, Michigan. In April 2007, the Debtor, while working at the facility, slipped off the roof and injured his knee. (Exh. 7 at 8, 11-12). He received medical treatment but his knee developed an antibiotic-resistant infection. This infection resulted in the Debtor being bedridden for approximately four months and ended with him being permanently disabled. (Trans. at 102; Exh. 7 at 7, 11-12).

5

Lacking any income, the Debtor defaulted on his Bank loans. Beginning in late 2007 or early 2008, he posted "for sale" signs at the Wisconsin Cottage and listed the Moon Lake Property for sale. (Trans. at 122, 171). In April 2008, the Bank commenced foreclosure proceedings in Wisconsin against the Wisconsin Cottage.

On May 14, 2008, the Debtor filed a chapter 13 case in the Eastern District of Wisconsin. He voluntarily dismissed that case on June 18, 2008 to facilitate the sale of the Moon Lake Property. In mid-2008, he sold the Moon Lake Property. All net proceeds were paid to the Bank. (Trans. at 22, 45, 105 & 150). Following the sale, the remaining Bank debt was approximately $400,000.

The Debtor continued to be disabled and unemployed. Although he had applied for both workers' compensation benefits and social security disability, neither benefit had been paid to him by mid-2008. (Trans. at 121, 142). As a result, the Debtor continued to be unable to pay the mortgage debt. The Bank continued its judicial mortgage foreclosure in Wisconsin. On July 15, 2008, it obtained a foreclosure judgment for $407,914.04, plus attorney's fees and costs. That judgment provided that the Wisconsin Cottage would be sold unless the Debtor satisfied the judgment within 12 months.[1]

The Bank also commenced a Michigan foreclosure by advertisement on the 3 - 40 Acre Parcels. On August 8, 2008, a Sheriff's Sale was conducted on

---

[1]   The court takes judicial notice of the prior Wisconsin chapter 13 and the Wisconsin state court judgment. FED. R. EVID. 201; FED. R. BANKR. P. 9017. The Bank raised the existence of the Wisconsin chapter 13 case and the Wisconsin state court foreclosure judgment in its opening statement and throughout the hearing. (Trans. at 13 & 22).

the 3 - 40 Acre Parcels.  The Bank was the highest bidder for $413,560.27, the full amount of the remaining indebtedness to the Bank.  (Debtor Exh. M; Trans. at 191-194).   The Debtor, in accordance with applicable Michigan law, had 12 months to redeem the property.

For several years prior to 2008, the Debtor maintained residences both in Michigan (Moon Lake Property and the Cabin Property) and in Wisconsin (Wisconsin Cottage).  (Trans. at 105, 120-121).  These properties are within a radius of approximately seven miles.   (Trans. at 62, 82).   Because of his disability, resulting total loss of income, and continuing mortgage foreclosures, the Debtor testified that he decided in mid-2008 to make the Cabin Property his domicile.   (Trans. at 78, 109, 122-123; Exh. 7 at 94-95). To accomplish the relocation, he took a number of steps.  He continued to post "for sale" signs at the Wisconsin Cottage and placed flyers at various nearby locations offering the property for sale.  (Trans. at 122, 171; Exh. 7 at 76-77).  He erected a mailbox on the public road near the Cabin Property and began receiving the bulk of his mail there.  (Trans. at 70, 108, 142-146; Debtor Exh. H, I, J & K).  In September, 2008, he opened a bank account at the Bank of Norway, Michigan, near the Cabin Property, and thereafter conducted all of his banking in Michigan. (Trans. at 124-125; Debtor Exh. B). In that account he maintained a continuing balance of between $19,000 to $39,000 during the six months prior to filing the bankruptcy case.[2]  In November 2008, he allowed his Wisconsin driver's license

---

[2]  The Debtor also had a Wisconsin bank account with a balance of only $6.00 but did not use it after opening the Michigan account.  (Trans. at 110-11, 124-25; Exh. C).

to expire and obtained a Michigan driver's license. (Trans. at 120-121; Debtor Exh. A). In the summer and fall of 2008, he worked with contractors to double the size of the Cabin, install a new roof and new windows, add a deck, and improve the outhouse. (Trans. at 56, 132-135; Exh. 7 at 43-46). Beginning in the fall of 2008 and continuing until approximately April 2009, the Debtor and his friends moved approximately 25 truckloads of personal property from the Wisconsin Cottage to either the Cabin Property or to storage units which he rented near the Cabin Property. (Trans. at 127-129; Debtor Exh. L; Exh. 7 at 78). In November 2008 and February 2009, he obtained Michigan titles on two vehicles previously titled in Wisconsin. (Trans. at 138-139; Debtor Exh. G). He began spending as much as sixty to seventy percent of his time at the Cabin Property. (Trans. at 134-135). He received all of his medical and dental treatment in Michigan, and none in Wisconsin during the six months prior to filing the bankruptcy. (Trans. at 141-142). He used the Cabin Property as his address for receiving almost all of his mail, including Social Security Disability Benefit payments and correspondence. (Trans. at 142 & 150; Debtor Exh. J). In July 2009, he filed his 2008 tax returns as a Michigan resident. (Trans. at 125-127; Debtor Exh. D). Finally, in July 2009, he contacted a Michigan lawyer to file this chapter 13 case. (Trans. at 147).

There are some steps that the Debtor failed to take in connection with his move to Michigan. Previously, the Debtor declared the Wisconsin Cottage to be his principal residence. This allowed him to save a small amount on his Wisconsin real property taxes (the "lottery credit"). Because the Debtor had not

8

yet told the Wisconsin taxing authorities that he had moved to Michigan, he saved $84.29 on his 2008 Wisconsin property tax bill as a result of the lottery credit.  Also, the Debtor had not yet filed for his Michigan Homestead Exemption which would allow him to save a portion of his Michigan real property taxes. Some of the Debtor's personal property remains at the Wisconsin Cottage -- approximately one-quarter of his furniture, a damaged boat, a canoe, some wearing apparel, approximately one-quarter of his antiques or collectibles, approximately one-fourth of his fishing gear, a 1978 Yamaha motorcycle and a 1969 Ford Mustang engine.

During trial, the court heard testimony and exhibits were admitted into evidence regarding the values of various assets.  The court's findings of the values of various categories of the Debtor's personal property are shown in the table below:

| Category | Michigan | Wisconsin |
|---|---|---|
| Cash | $400.00 | |
| Bank Deposits | $29,242.31[3] | (Debtor Exh. C) $6.23 |
| Check | $5,390.41[4] | |
| Union Disability Claim | $275.51[5] | |
| Household Goods | $15,000.00 | $5,000.00 |
| Books, Records | $1,666.00 | $334.00 |
| Coin Collection | $1,000.00 | |
| Antique | $2,625.00 | $875.00 |

[3]  This is an average of the Debtor's monthly balances for the months ending February 10, 2009 through August 10, 2009. (Debtor Exh. B).

[4]  This is a check for $10,780 from State Farm Insurance to reimburse Debtor for repairs he paid for to Wisconsin dock.  Since it is made jointly payable to the Bank, the court has reduced its value by one-half.

[5]  This is the monthly amount the Debtor would be paid by a Michigan Union Welfare plan if his pending claim is allowed.  Upon allowance, the value of this asset would be much greater than $275, but there are insufficient facts in the record to support an increase in the scheduled valuation.

| | | |
|---|---|---|
| Clothes | $150.00 | $150.00 |
| Jewelry | $1,000.00 | |
| Photo Equipment | $750.00 | |
| Fire Arms | $1,200.00 | |
| Sports Equipment | $600.00 | $200.00 |
| Retire. Annuity | $1,065.00[6] | |
| Union Pension | $2,006.00 | |
| Wisc. Malpractice Claim | | -0-[7] |
| Trucks & Cars | $40,800.00 | |
| 1978 Yamaha and 1969 Engine | | $3,900.00 |
| 2003 Yamaha and Truck Trailer | $5,200.00 | |
| Boat and Canoe | | $2,500.00 |
| | | |
| TOTAL: | $108,370.23 | $12,815.23 |

The Michigan personal property is valued at $108,370.23.  The Wisconsin personal property is valued at $12,815.23.

Regarding the value of the real property and ignoring the legal issue of the effect (if any) of the Debtor's trust, the court finds the values in accordance with the table below:

---

[6]   As with the union disability claim, this is an estimated monthly payment the Debtor would receive from his Michigan union if his pending claim was allowed. Upon allowance, this asset would be much greater than $1,065, but there are insufficient facts in the record to support an increase in the scheduled valuation.

[7]   This claim arose out of medical treatment received by the Debtor in the spring of 2007 following his injury in April.  The Debtor has neither commenced suit nor retained an attorney to do so.  The court notes that the Wisconsin statute of limitations for medical malpractice claims is generally only three years.  *See* Wisc. Stat. Annot. § 893.55.

| Category | Michigan | Wisconsin |
|---|---|---|
| Wisconsin Cottage | -0- | $ 284,000[8] |
| Moon Lake Property | $0[9] | -0- |
| 3-40 Acre Parcels | $225,000[10] | -0- |
| Michigan Cabin Property | $75,000[11] | -0- |
|  |  |  |
| TOTAL: | $300,000 | $284,000 |

The Michigan real property is valued at $300,000. The Wisconsin real property is valued at $284,000.

The total value of all Michigan property is $408,370.23. The total value of all Wisconsin property is $296,815.23.

## V. DISCUSSION.

A.    *The Venue Statute.*

The question to be decided is whether venue for the Debtor's bankruptcy case properly lies in the Western District of Michigan. The applicable venue statute provides, in pertinent part, as follows:

---

[8]   Value is based, in great part, upon the Bank's appraisal as of December 21, 2007.

[9]   The Moon Lake Property was sold in 2008 and nearly all proceeds of the sale were paid to the Bank.

[10]   Although the taxing authorities indicate values of (a) Wisconsin Cottage - $143,100; (b) 3-40 Acre Parcels - $228,000 and (c) Cabin Property - $84,000, the court believes the more accurate value is established by the Bank's appraisal. That appraisal combines the 3-40 Acre Parcels and the Cabin Property with a total value of $300,000. The court has prorated the total value based upon acreage and has discounted the value of the improvements on the Cabin Property because of potential problems in maintaining access to that property.

[11]   *See* note 10 supra.

> Except as provided in section 1410 of this title, a case under [the Bankruptcy Code] may be commenced in the district court for the district --
>
> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person . . . that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district . . . .

28 U.S.C. § 1408(1).

The four bases for venue in § 1408 are in the alternative. If it is established that the Debtor meets any *one* of the four tests (domicile, residence, principal place of business *or* principal assets), venue is proper in the Western District of Michigan. "The four tests for venue are given in the alternative and, thus, any of the four is jurisdictionally sufficient." *Broady v. Harvey (In re Broady)*, 247 B.R. 470, 472 (Bankr. 8th Cir. 2000); *see also HSBC Bank USA v. Handel (In re Handel)*, 253 B.R. 308, 310 (Bankr. 1st Cir. 2000); *In re Cole*, 2008 WL 2857118, *2 (Bankr. N.D. Tex. July 21, 2008) ("It is not necessary for the filing party to show that the district in which the case was filed is appropriate based on all factors. The tests of domicile, residence, principal place of business, and location of principal assets should be viewed as alternative tests."); *In re Gurley*, 215 B.R. 703, 707-08 (Bankr. W.D. Tenn. 1997).

The Debtor contends that, for at least a majority of the 180-day period, he was both domiciled in the Western District of Michigan and maintained his principal assets there. The Bank disputes the Debtor's contentions.

12

B.    *Burden of Proof.*

Many courts that have ruled on the burden of proof regarding objections to bankruptcy venue have decided that there is a presumption that the debtor has filed in the correct district; the party objecting to venue is required, by a preponderance of evidence, to show that venue is improper.  *See, e.g., In re Peachtree Lane Associates, Ltd.,* 150 F.3d 788, 792 (7th Cir. 1998); *In re Handel,* 253 B.R. at 310; *In re Broady,* 247 B.R. at 472-73; *In re Farmer,* 288 B.R. 31, 34 (Bankr. N.D.N.Y. 2002).  This court agrees that the burden to demonstrate improper venue is initially upon the objecting party, in this instance, the Bank.  However, given the great weight of the evidence, the burden of proof issue is not dispositive in this case.

The applicable 180-day period for venue is February 2, 2009 through August 2, 2009.  The court will first address whether the Debtor was domiciled in Michigan for the majority of the 180-day statutory period.  Then, and only if necessary, the location of the Debtor's principal assets shall be addressed.

C.    *Domicile.*

Domicile is largely a matter of intention.  *Williamson v. Osenton,* 232 U.S. 619, 625, 34 S. Ct. 442, 443 (1914).  The Sixth Circuit Court of Appeals has phrased the question as follows:   "[t]he location of a person's domicile at any given time is a *question of intent*:  what is the fixed location to which he intends to return when he is elsewhere?" *Detroit Lions, Inc. v. Argovitz,* 767 F.2d 919, 1985 WL 13394, *2 (6th Cir. 1985) (unpublished table opinion) (emphasis added). "Thus, domicile is an individual's permanent place of abode where he need not

13

be physically present, and residence is where the individual is physically present much of the time. An individual consequently may have several residences, but only one domicile." *Eastman v. University of Michigan*, 30 F.3d 670, 673 (6th Cir. 1994).

To determine the Debtor's intent, his testimony is relevant but not determinative. This court will also consider objective evidence that establishes the Debtor's intent. *In re Cole*, 2008 WL 2857118, *2 (Bankr. N.D. Tex. 2008) (citing *Coury v. Prot*, 85 F.3d 244, 251 (5th Cir. 1996)). No minimum period of residency is required to establish domicile. *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 701 (1st Cir. 1979). "Illustrative indicia of intent include affidavits of intention, . . . registration for driver's licenses, opening bank accounts, addressing tax returns, motive for establishing domicile, and other physical facts evidencing that the desire to remain will not expire . . . ." *Stifel v. Hopkins*, 477 F.2d 1116, 1122 (6th Cir. 1973).

The Bank contends that the Debtor's domicile is in the Eastern District of Wisconsin. To support its objection to venue in this district, the Bank makes three observations:

1.     Some years ago, the Debtor filed a statement with the taxing authorities in Wisconsin declaring the Wisconsin Cottage to be his principal residence. By obtaining the lottery credit the Debtor paid a lesser amount of real estate taxes in Wisconsin.

2.     In May 2008, the Debtor filed a chapter 13 case in the Eastern District of Wisconsin.

14

3.      When the current bankruptcy case was filed, the Debtor had not yet filed for the Michigan Homestead Exemption.

However, these three objective factors raised by the Bank are far outweighed by both the subjective and objective evidence that the Debtor was domiciled in the Western District of Michigan.

The Debtor has resided within seven miles of his birthplace in Iron Mountain, Michigan for his entire life.  The Debtor was born in Michigan.  The Debtor was employed in Michigan.   The Debtor's parents were Michigan residents.   The Debtor was educated in Michigan.   The Debtor earned his certification as a union journeyman plumber and pipefitter in Michigan.   During the applicable venue time period, the Debtor's Wisconsin Cottage mortgage was being foreclosed by the Bank.

The Debtor credibly testified that by mid-2008, it was his intention to make the Michigan Cabin Property his domicile.   The Debtor's stated subjective intention is overwhelmingly buttressed by the objective facts.[12]

---

[12]      As a result of the 2007 injury, the Debtor was permanently disabled and unable to service the Bank's mortgage debt.

After late 2007, the Debtor offered the Wisconsin Cottage for sale and posted for sale signs on the property.

By August, 2008, all of the Debtor's (or Trust's) real property was subject to the Bank's foreclosure except for the Michigan Cabin Property.

In the fall of 2008, the Debtor hired contractors to substantially improve the Michigan Cabin Property, by doubling its size, adding a new roof, adding a deck, adding a generator to supply electricity, and adding a propane tank to cook food and heat the cabin.

In September 2008, the Debtor opened a bank account with the State Bank of Norway, Michigan, which he used exclusively thereafter.

Beginning in the fall of 2008 and continuing into April, 2009, the Debtor moved the vast majority of his personal property from the Wisconsin Cottage to

15

All of the objective factors existed or were taken by the Debtor well prior to the filing of this bankruptcy case.[13]

D.    *Location of Principal Assets.*

Under 28 U.S.C. § 1408(1), an alternative basis for venue is the location of the debtor's principal assets during a "longer portion of such one-hundred-eighty-day period" immediately prior to the bankruptcy filing.

In this case, based upon the Debtor's testimony and the corroborating exhibits, together with the Debtor's sworn schedules, personal property valued at $108,370.23 is located in this district.  The value of personal property located in Wisconsin is only $12,815.23.

The location of the Debtor's real property is more complicated.  All real property was placed by the Debtor into the Trust.  (Exh. 1 and Debtor's Exh. E.)

---

Michigan, using it to furnish the Michigan Cabin Property and storing the balance in a Michigan storage facility.

The Debtor's dentist and doctor are both in Michigan.   He regularly receives his medical treatment at a hospital in Marquette, Michigan.

In November 2008, the Debtor's Wisconsin driver's license expired.  The Debtor immediately obtained a Michigan driver's license.

Also in November 2008, the Debtor applied for Michigan titles for his two vehicles which were previously titled in Wisconsin.  By February, 2009, all of the Debtor's vehicles were titled in Michigan.

The Debtor filed his 2008 state income tax return as a Michigan resident.

The Debtor receives most of his mail at the Michigan Cabin Property.

The Michigan Cabin Property has been the Debtor's address of record for the Social Security Administration and his union pension plan.

Although it cannot be quantified, the Debtor resides approximately 50% of the time at the Michigan Cabin Property.

The Debtor, before filing this bankruptcy case, consulted with a Michigan lawyer and prepared all of his pleadings as a resident of the Western District of Michigan.

[13] The Bank argues that the Debtor "engineered" much of the proof of Michigan domicile.  (*See* Bank's Closing Argument in Support of Its Motion to Dismiss, p. 8; Trans. at 12-14).  The court disagrees.

The Debtor was the settlor and the sole trustee.  The Trust was not recorded and may be characterized as "secret."  The Debtor retained all rights to the real property in the Trust.  The Trust itself unambiguously specifies that Michigan is the Trust situs.  Based upon the court's cursory examination of Michigan law, the trust (and the real property subject to the trust) is a Michigan asset.  *See, e.g., Thibert v. Metcalf (In re Pine Hill Trust)*, 2002 WL 31951242, *1 (Mich. App. Dec. 10, 2002).  However, even assuming the trust is considered to be invalid, unenforceable or nugatory, the evidence is that the great bulk of the Debtor's real property is located in Michigan.[14]

Although the court believes, based upon the totality of evidence, that the Debtor's principal assets are located in Michigan, it is not now necessary to make such a holding.  *See In re Dutkiewicz*, 408 B.R. 103, 110 (Bankr. 6th Cir. 2009) (citing *BellSouth Telecomm., Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008) (deciding only what is necessary)).  There are four possible bases for proper venue.  Any one standing alone is sufficient.  *In re Broady*, 247 B.R. at 472.

## V.  CONCLUSION.

---

[14]  Further complicating an analysis is the fact that, as of the filing date, the Bank held a Sheriff's Deed to the 3-40 acre parcels located in Michigan.  Did the Bank thereby hold legal title to the real property (subject to the Debtor's redemption rights) or did the Debtor continue to legally own the foreclosed real property?  The Debtor (or the Trust) very probably held legal title until the expiration of the equity of redemption period on August 8, 2009.  *See, e.g., Bankers Trust Co. of Detroit v. Rose*, 322 Mich. 256, 260, 33 N.W.2d 783, 785 (1948).  However, this need not be researched more fully or decided now.

17

The Debtor is, and has been, domiciled in Michigan.  Venue is proper in the Western District of Michigan.  The Bank's motion to dismiss the case based upon improper venue is denied.

A separate order shall be entered accordingly.

Honorable James D. Gregg
Chief United States Bankruptcy Judge

Dated this 9th day of July, 2010