UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re:                                              Case No. GM 09-90569
                                                    Chapter 13
RICHARD K. MILLER,

        Debtor.
_____/

## OPINION REGARDING MOTION FOR RELIEF FROM STAY
## AND OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN

Appearances:

Robert D. Heikkinen, Esq., Marquette, Michigan, attorney for Richard K. Miller.
Gregory Siebold, Esq., Iron Mountain, Michigan and Frederick C. Wieting, Esq.,
        Green Bay, Wisconsin, attorneys for State Bank of Florence.

## I. PROCEDURAL BACKGROUND AND ISSUE.

Richard K. Miller (the "Debtor") filed his chapter 13 bankruptcy case on August 3, 2009. At the time the case was filed, the Debtor also filed his original Chapter 13 Plan. He treated the State Bank of Florence (the "Bank") as a secured creditor holding a claim secured by a mortgage on certain real property owned by the Debtor in Wisconsin (the "Spread Eagle Property"). Subsequently, the Debtor filed a Preconfirmation Amended Chapter 13 Plan on August 11, 2009, a Second Chapter 13 Plan Amendment dated September 18, 2009, and a Third Chapter 13 Plan Amendment dated August 25, 2010 (collectively the "Debtor's Plan"). In each of the amendments, the Debtor proposes to pay the Bank nothing, contending the Bank has been "paid in full" as a result of the Bank's prepetition sale by advertisement foreclosure of a real property mortgage in Michigan (sometimes referred to as the "Michigan Foreclosure Sale"). At that

foreclosure sale, the Bank bid $413,560.27, an amount equal to the entire indebtedness owed by the Debtor to the Bank.

The Bank filed an Amended Objection to Confirmation of Chapter 13 Plan as Amended (the "Objection"). The Bank asserts that the Debtor's Plan is not confirmable because (1) it "fails to provide that the State Bank of Florence retains its lien interest" in the Spread Eagle Property, and (2) the Debtor's Plan does not "adequately protect" the Bank's mortgage interest in that property.  In addition, the Bank has filed a Renewed Motion for Relief from Automatic Stay (the "Motion") "for the purpose of filing an action to undo and reverse a foreclosure by advertisement on certain Michigan real estate securing the Bank's claim and also to proceed with a foreclosure sale of [the Spread Eagle Property]."  In his response to the Motion, the Debtor argues that the Bank has not shown "cause" for relief from the stay because it has no remaining claim against him.

The court combined the hearings on the Objection and the Motion because both present the same issue.  In its August 23, 2010 Scheduling Order, the court advised the parties "that the major issue to be determined is the amount of the debt, if any, owed by the Debtor to the Bank."

The court held evidentiary hearings on August 18 and September 7, 2010 during which twenty-seven exhibits were admitted into evidence. (Exhs. A-C, E-K, M-Y, and AA-CC; Exh. 1.)  The court heard testimony from one witness, Clyde Nelson, Vice President of the Bank.  Each of the parties have made legal argument in the form of various motions, replies, and briefs/memoranda. In addition, the parties had previously briefed this major issue in connection with the Bank's earlier motion to dismiss the case

2

for alleged improper venue. That motion was denied by this court. When the venue issue was determined, the court declined to rule on the validity or amount of the Bank's claim noting it would likely be considered in connection with confirmation. In re Miller, 433 B.R. 205, 207 (Bankr. W.D. Mich. 2010).

## II. JURISDICTION.

The court has jurisdiction over this bankruptcy case. 28 U.S.C. § 1334(a). This contested matter is a core proceeding. 28 U.S.C. § 157(b)(2)(A) (estate administration); 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims); 28 U.S.C. § 157(b)(2)(G) (relief from the automatic stay); and 28 U.S.C. § 157(b)(2)(L) (confirmation of plan). This court is authorized to hear and decide the Objection and the Motion. 28 U.S.C. § 157(a); L.R. 83.2(a) (W.D. Mich.). This opinion states the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## III. FACTS.

The Motion and Objection are but the latest of a series of disputes between the parties. Many of the background facts are set forth in the court's prior venue opinion. Miller, 433 B.R. at 207-11.

A.  *General Background.*

The Debtor was born on November 13, 1955 in Iron Mountain, Michigan, a small Michigan city located on the Michigan/Wisconsin border. The Debtor has always lived within a few miles of Iron Mountain. By 2006, the Debtor was the owner of a number of parcels of real property: one in Wisconsin (the "Spread Eagle Property"); and three in Michigan (the "Moon Lake Property," the "Cabin Property," and the "3-40 Acre Parcels"). The Debtor inherited the Moon Lake Property from his parents. The Cabin Property

3

was purchased by the Debtor during the 1990s. It is a forty acre parcel, adjoining and south of the 3-40 Acre Parcels. The 3-40 Acre Parcels are three contiguous parcels which the Debtor acquired through inheritance and purchase. The Spread Eagle Property is a lake-side house which the Debtor had also acquired through inheritance and purchase. Miller, 433 B.R. at 207.

Following high school, the Debtor, who had been employed in his father's plumbing business, became a union certified journeymen plumber and pipefitter. He was employed through the Upper Peninsula of Michigan Plumbers and Pipefitters Union No. 111. However, in 2006, the Debtor developed a serious heart condition which required the implantation of a pacemaker. As a result of this illness, the Debtor was unemployed during most of 2006. Because of his pacemaker, the Debtor was unable to work near certain welding equipment and could no longer be employed as a journeymen plumber and pipefitter. Miller, 233 B.R. at 208.

In early 2007, the Debtor eventually found employment with the maintenance department of the Iron County Medical Care Facility. However, in April 2007, the Debtor, while working at the Facility, slipped off a roof and injured his knee. The knee developed an antibiotic-resistant infection. As a result, the Debtor was bedridden for several months and became permanently disabled. Miller, 233 B.R. at 208.

The Debtor's medical problems caused a complete loss of his income. As a result, in October 2006, and thereafter, he obtained loans from the Bank. To secure those loans, the Debtor gave mortgages to the Bank which covered all parcels of his real property, with the exception of the Cabin Property. Miller, 233 B.R. at 208.

4

B.    *The Various Loans and Mortgages.*

The Debtor's initial borrowing was on October 16, 2006 in the amount of $221,444.29 ("Note 1"). (Exhs. E and R.)   Note 1 was secured by a real estate mortgage dated October 16, 2006 on the Spread Eagle Property. (Exhs. E and S.)   The October 16, 2006 mortgage provides that it serves as collateral for:

> [A]ll obligations, debts and liabilities, plus interest thereon, of [the Debtor to the Bank] . . . whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated . . . .

(Exh. S.)

When Note 1 was entered into, the Debtor applied for, and apparently received, a $100,000 line of credit ("Note 2") from the Bank.  (Exh. I.)  The Revolving Line of Credit document, also known as the "Credit Agreement," was never introduced into evidence. The court finds that Note 2 was funded, in whole or in part, because the Debtor granted a mortgage on the 3-40 Acre Parcels which states that it secures the Revolving Line of Credit/Credit Agreement.  (Exh. M.)  Apparently, Note 2 was either paid in full by the Debtor or incorporated into a later loan by the Bank, because the Bank offered no evidence that any amounts remained owing to it on Note 2.  Likewise, the Bank's Proof of Claim makes no reference to obligations owed to it under the Revolving Line of Credit/Credit Agreement.

On December 22, 2006, the Debtor applied for a $300,000 loan from the Bank. (Exh. J.)  The application provides that $300,000 was to "refinance" an existing debt of $300,000.  However, no proofs were offered as to whether the refinanced debt was owed to the Bank as a result of a prior loan or whether the debt was owed to another

5

financial institution.   Likewise, no proofs were offered to show if Note 2 was incorporated within the $300,000 to be "refinanced."  No evidence was introduced as to any loan which resulted from the December 22, 2006 loan application ("Note 3"). Assuming money was loaned, the Bank no longer claims any amount remains unpaid to it on Note 3.  (Bank Proof of Claim.)

Finally, on January 20, 2007, the Debtor gave a $400,000 note ("Note 4") to the Bank.  (Exh. T.)  That Note states that it is secured by the January 20, 2007 mortgage (Exh. U), the October 20, 2006 real estate mortgage (Exh. M), and a real estate mortgage dated January 20, 2006 (never introduced into evidence).  Like Note 1, the Bank claims that Note 4 was at least partially unpaid as of the filing of this case.  (Bank Proof of Claim.)

C.    *The Foreclosures.*

During 2008, the Debtor continued to be disabled and unemployed.  Although he had applied for both workers' compensation and social security disability benefits, neither benefit was quickly approved or promptly paid to him.  As a result, the Debtor defaulted on his Bank loans. Miller, 233 B.R. at 208-09.  This caused the Bank to begin taking a number of actions to foreclose its mortgages to repay itself the loans.

The Bank officer in charge of the foreclosure of the mortgages was Clyde Nelson ("Nelson"), the Bank's senior credit officer. (Trans. at 46.) Nelson is an experienced banker who has been foreclosing mortgages, both in Wisconsin and Michigan, since 1980. (Trans. at 46.)

The Bank retained both Wisconsin and Michigan counsel.  In April, 2008, the Bank's Wisconsin counsel instituted a judicial mortgage foreclosure action on the

6

Spread Eagle Property in Wisconsin. (Exh. S; Trans. at 48.) The Bank's Michigan counsel was retained to non-judicially foreclose (commonly called "foreclosure by advertisement") its January 20, 2006 and January 20, 2007 mortgages on the 3-40 Acre Parcels. (Mich. Comp. Laws Ann. §§ 600.3201-3285; Exhs. W and X.) On April 10, 2008, the Bank's Michigan attorney published two notices of foreclosure sales regarding the two Michigan mortgages, scheduling the foreclosure by advertisement sales. (Exhs. W and X.) In both notices of foreclosure, the Bank stated "no other legal or equitable proceedings have been instituted to recover the debt secured by this Mortgage and the power of sale in the Mortgage has become operative by reason of default." Id.

The Debtor did not appear in or defend the Wisconsin judicial foreclosure. However, on May 14, 2008, prior to the scheduled Michigan foreclosure by advertisement sales, the Debtor filed his first chapter 13 case. This caused the Michigan foreclosure sales to be adjourned by the automatic stay. 11 U.S.C. § 362.

Shortly after the filing of the first chapter 13 case, a buyer was found for the Moon Lake Property. To facilitate the sale of the Moon Lake Property, the Debtor voluntarily dismissed his first chapter 13 case on June 18, 2008. The sale of the Moon Lake Property occurred thereafter, and all net proceeds of the sale were paid to the Bank. Miller, 433 B.R. at 211, n.9.[1]

Somewhat surprisingly, the precise amount and application of the proceeds realized from the Moon Lake Property sale were not introduced into evidence. However, following that sale, the Bank believed the Debtor owed it unpaid balances on

---

[1] The court takes judicial notice of the first chapter 13 case and the Wisconsin judicial foreclosure. FED. R. EVID. 2001; FED. R. BANKR. P. 9017. The Bank has raised the existence of the first chapter 13 case and the Wisconsin foreclosure litigation throughout the venue hearing and during the consolidated hearing on the Objection and Motion.

7

Notes 1 and 4. According to the Bank, those unpaid balances totaled $413,560.27, which was the entire amount owed by the Debtor on all loans. (Trans. at 50.)

After dismissal of the first chapter 13 case and the completion of the Moon Lake Property sale, the Bank continued its Wisconsin foreclosure litigation. On July 15, 2008, the Wisconsin court "granted a judgment of foreclosure, finding the Debtor owed $407,914.04 as of July 15, 2008 plus interest thereafter and attorney's fees and costs." (July 15, 2008 Wisconsin Foreclosure Judgment).

Approximately two weeks after the Wisconsin Foreclosure Judgment, the Bank published, on July 31, 2008, a new Michigan notice of foreclosure by advertisement of the 3-40 Acre Parcels. The notice scheduled a foreclosure sale on August 8, 2008. The notice stated "no legal or equitable proceedings have been instituted to recover the debt secured by the mortgage and the power of sale in the mortgage has become operative by reason of such default." (Exh. V.)

The Michigan Foreclosure Sale occurred on August 8, 2008. (Mich. Comp. Laws Ann. § 600.3216; Exh. 1.) The Bank, as the only bidder, credit bid $413,560.27, *the full amount owed by the Debtor to it.* (Trans. at 50.) The decision regarding the credit bid was made by Nelson and the Bank's Michigan and Wisconsin foreclosure attorneys. (Trans. at 49.) Following the Michigan Foreclosure Sale, a Sheriff's Deed, drafted by a Bank's attorney, was recorded in Michigan. The Sheriff's Deed stated that the 3-40 Acre Parcels were sold to the Bank for $413,560.27. That deed contained the affidavit of the auctioneer, the Dickinson County (Michigan) Sheriff's Department, stating that the bid had been made by "the [Bank] and that said sale was in all respects open and fair; and that I [the sheriff] did strike off and sell said lands and tenements to said bidder [the

8

Bank], which *purchased* the said lands and tenements fairly, and in good faith, as deponent verily believes." (Mich. Comp. Laws Ann. § 600.3232; Exh. 1) (emphasis added).

The Debtor did not take any part in the Michigan foreclosure. The Bank was the sole participant in the Michigan Foreclosure Sale process which was exclusively controlled by it. (Trans. at 68.) Any mistakes in the foreclosure process were unilateral on the part of the Bank. (Trans. at 69.) The Bank's attorney had advised it, prior to the Michigan Foreclosure Sale, that its Note 1 (Exh. R) was not, in his opinion, secured by the January 20, 2007 mortgage. However, based on its attorney's advice, the Bank bid an amount at the foreclosure equal to the Debtor's total remaining indebtedness. (Trans. at 72.)

Following the Michigan Foreclosure Sale and the recording of the Sheriff's Deed, neither the Bank nor the Debtor filed any action to seek to avoid the sale. Rather, after the one year redemption period expired (as extended by 11 U.S.C. §108), the Bank treated the 3-40 Acre Parcels it purchased at the sale as its own property. (Trans. at 54.) Although the Bank's successful bid was $413,560.27, upon expiration of the one year statutory redemption period, the Bank failed to credit the full amount or its bid to satisfy the Debtor's loans. Rather, it credited the Debtor with a lesser amount equal to only the remaining balance due on Note 4. The Bank did not pay to the sheriff the difference between the lesser amount owed on Note 4 and its $413,560.27 bid. (Trans. at 56-57.) The January 20, 2007 mortgage foreclosed at the Michigan Foreclosure Sale states that any surplus "after payment in full of the sums then due under the mortgage and expenses of the sale, including attorney's fees" will be paid "to Grantor [the

Debtor]." (Exh. U.)  Any surplus amount that should have been paid to the Debtor was not paid by the Bank.

Although the precise value of the 3-40 Acre Parcels foreclosed at the August 8, 2008 sale is unknown, it is apparent that the Bank believes (and the court agrees) that the value of the parcels purchased by the Bank is less than the Bank's $413,560.27 credit bid.  This finding is buttressed because the Bank has contended throughout this case that the property is "worth far less than the entire indebtedness bid at the foreclosure sale."  (Bank Renewed Motion for Relief from Automatic Stay; Exh. O ($225,000 appraisal)).

## IV.  DISCUSSION.

Boiled down, the controlling facts are fairly straightforward.  The Debtor borrowed a large amount of money from the Bank.  The Bank was given mortgages on real property located in Wisconsin and Michigan.  After the Debtor defaulted, the Bank instituted a judicial foreclosure on the Wisconsin property and a foreclosure by advertisement on the Michigan property.

The Bank, from its perspective, made a terrible unilateral mistake.  It bid the entire amount of its debt in the Michigan foreclosure.  The Debtor did not redeem the Michigan foreclosure deed and the Bank now owns the Michigan property.  Because the value of the Michigan property is very likely less than what the Debtor owed the Bank, the Bank now wants to continue the Wisconsin foreclosure to reduce or eliminate its monetary loss.

The Debtor's perspective is far different.  He asserts all debt owed to the Bank was fully satisfied as a result of the Michigan foreclosure.  The Debtor takes the position

10

that he owns the Wisconsin property free and clear of the Bank's prior mortgage; the Wisconsin foreclosure action should be dismissed.

A.   *Choice of Law.*

The Bank strenuously argues that Wisconsin law must be applied to all the relevant facts.  It stresses a provision in the *promissory notes* executed by the Debtor which states as follows:

> "This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Wisconsin without regard to its conflicts of law provisions."

(Exhs. E, R, and T.)

The Bank then argues that because Wisconsin does not have a statutory procedure for foreclosure by advertisement and because judicial foreclosure in Wisconsin requires the state court to find that "the price paid reflects the fair value of the property," the current dispute could never have arisen in Wisconsin.  The court rejects this argument.

This contested matter does *not* involve any question of the validity of the promissory notes.  Rather this matter involves the validity and effect of the Bank's decision to purchase Michigan real estate at the Michigan Foreclosure Sale.  The choice of law provision in the Wisconsin promissory notes is inapplicable.  It is the effect and validity of the Michigan Foreclosure Sale, not the promissory notes, which is the proper focus of this dispute. The Debtor is insisting that the Bank honor its unilateral and voluntary credit bid made in Michigan at the Michigan Foreclosure Sale to purchase the Michigan real estate for $413,560.27.  The determination of the dispute is governed by Michigan law.

11

On August 8, 2008, the Bank agreed to purchase the foreclosed property for $413,560.27. As stated in the Sheriff's Deed issued as a result of the Michigan Foreclosure Sale, the sheriff "[sold] the lands and tenements to the grantee [the Bank] for the sum of Four Hundred Thirteen Thousand Five Hundred Sixty and 27/100 ($413,560.27) Dollars, that being the highest bid therefore and the grantee [the Bank] being the high bidder . . . ." (Exh. 1.) The deed further provided: " . . . that I, the Under Sheriff . . . have granted, conveyed, bargained and sold, and by this deed, do grant, convey, bargain and sell unto the grantee [the Bank], its successors and assigns, forever . . . ." (Exh. 1.)

It is black letter law that the enforceability of agreements to purchase real property is generally governed by the law of the place where the property is situated.

> The contractual duties imposed upon the parties to a *deed of transfer of an interest in land* are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the land is situated .
> . . .

Restatement (Second) of Conflict of Laws § 190 (2010) (emphasis added).

Contracts made in, and to be performed in, Michigan are governed by Michigan law. Also, transfers of interests in real property are determined by state law where the real property is located. Likewise, the Michigan Foreclosure Sale, a creature of statute, is governed by Michigan, not Wisconsin, law. "The method for the foreclosure of a mortgage on land and the interests in the land resulting from the foreclosure are determined by the local law of the situs." Id. at § 223. "The transfer of real property is regulated by the lex loci rei sitae, i.e., the law of the state in which the property is located." O'Berry v. Pitcairn Dev., 2009 WL 2913587, at *2 (Mich. App. 2009).

The Sixth Circuit is in agreement:

> It appears that the land which is the subject-matter of the contract is situated in the State of Kentucky, and *we think it is well settled that controversies arising out of contracts for the sale of land must be determined by the law of the state wherein the land is situated* . . . .

Freeman v. Falconer, 201 F. 785, 787 (6th Cir. 1913) (emphasis added); see, Coral Gables v. Hanley, 87 F.2d 780, 781 (6th Cir. 1937) (regardless of the state in which the land contract was executed, "it covers Florida land, and Florida law controls").

B.   *Mortgagee as "Purchaser."*

The Bank unilaterally chose to utilize the Michigan statute on foreclosure by advertisement and unilaterally decided to bid $413,560.27, the full amount of the debts owed to it by the Debtor, at the Michigan Foreclosure Sale. The Bank realizes that its bid was imprudent because the property purchased is very probably worth less than its bid; it seeks to credit the Debtor with an amount less than the bid. The Bank is legally forbidden from doing so.

The governing Michigan statute contemplates that the mortgagee [the Bank] may purchase the foreclosed real property at the sale. Mich. Comp. Laws Ann. § 600.3228 ("The mortgagee . . . may . . . purchase the premises . . . at such sale."). However, if the mortgagee bids more than the value of the property purchased, it, like any other purchaser at a mortgage foreclosure sale, will be required to pay or credit the mortgagor, in this instance, the Debtor, with the entire amount of the bid. This is the law in Michigan, as it is in other jurisdictions.

In Pulleyblank v. Cape, 179 Mich. App. 690, 446 N.W.2d 345 (1989), the mortgagee, Pulleyblank, bid the full amount of the debt owed to it at a foreclosure sale that was conducted under the Michigan foreclosure by advertisement statute. When the

13

property appeared to be worth less than the full value of the debt, the mortgagee then sought to foreclose upon a second different parcel of property and to credit the mortgagor with only the alleged fair market value of the original parcel purchased. The court prohibited the mortgagee from proceeding with the second foreclosure sale stating:

> However, as a purchaser under the foreclosure sale, the mortgagee stands in the same position as any other purchaser. Hogsett v. Ellis, 17 Mich. 351, 363 (1868). If a third party had bid and purchased this property for $251,792 [the full amount of the debt which the mortgagee was owed], regardless of its appraised value, that is the amount Pulleyblank would have received and credited on the debt. Certainly Pulleyblank could not argue in that situation that, since the property was worth only $103,000, the Capes [the mortgagors] could only receive credit for $103,000 on the debt and Pulleyblank should be able to pocket the windfall from the sale. Likewise, Pulleyblank, as the purchaser, "paid" $251,792 for the property even though no actual cash exchanged hands. Therefore, Pulleyblank, as mortgagee, "received" $251,792 for the Howell property and this purchase price must be applied to the debt.

Pulleyblank, 179 Mich. App. at 694-95, 446 N.W.2d at 347 (emphasis added).

The Pulleyblank court also stated:

> It would defy logic to allow Pulleyblank to bid an inflated price on a piece of property to ensure that they would not be overbid and to defeat the equity of redemption and then claim that the "true value" was less than half the value of the bid.
>
> . . .
>
> Pulleyblank by their own actions extinguished the debt by the bid on the Howell property. It follows that there was no debt to support the foreclosure of the [other] Plymouth property. Accordingly, the trial court's rulings concerning the Plymouth property and the indebtedness was correct.

Id. at 695-96; 446 N.W.2d at 348; see also, Bank of Three Oaks v. Lakefront Props., 178 Mich. App. 551, 555, 444 N.W.2d 217, 219 (1989) ("[T]he bank's purchase of the

14

property for the entire amount of the outstanding indebtedness extinguished [the mortgagee's] debt and mortgage.").

Also instructive is Chrysler Capital Realty, Inc. v. Grella, 942 F.2d 160 (2d Cir. 1991). In that opinion, the Second Circuit Court of Appeals applied Michigan law to a situation where the mortgagee sought to bring an action for damages against the mortgagor after the mortgagee had bid in the full amount of the debt at a Michigan foreclosure sale. The mortgagee argued that the original mortgage had been procured by fraud and, therefore, the mortgagee was free to sue the mortgagor notwithstanding its prior full credit bid at the foreclosure sale. The Second Circuit rejected the mortgagee's action for damages. Even assuming fraud in the original mortgage, the court refused to allow the mortgagee to proceed because there was *no deficiency*. It stated:

> The Whitestone rule [Whitestone Savings and Loan Assn. v. Allstate Ins. Co., 28 N.Y.2d 332, 270 N.E.2d 694 (1971)] protects mortgagors from deficiency judgments after a foreclosure sale and brings certainty to the foreclosure proceedings. Although a borrower may fraudulently induce a mortgage loan, the mortgagee may always limit his damages from the fraud by bidding for the security no more than its fair value at the time of the foreclosure sale. Moreover, applying Whitestone in some circumstances, but not others, would, in effect, destroy its utility in all circumstances. *We think Michigan courts, after balancing the policy interest at stake, would hold that the policies embodied in Whitestone cannot be sacrificed even in the face of the type of fraud alleged here.*
>
> Finally, Whitestone itself, which has been imported into Michigan law, advises: "The rule is not harsh and it is eminently practical. None disputes that the mortgagee is entitled to recover only his debt. . . . Indeed, it is not conceivable that the mortgagee could recover a deficiency judgment against the mortgagor if it had bid the full amount of the debt at the foreclosure sale. *To allow the mortgagee, after effectively cutting off or discouraging lower bidders, to take the property - - and then establish that it was worth less than the bid - - encourages fraud, creates uncertainty as to the mortgagor's rights, and most unfairly deprives the sale of whatever leaven comes from other bidders. Mortgagees have the obvious*

15

*opportunity to bid only so much of the debt as equal of the value of the property . . . ."*

Grella, 942 F.2d at 163-64 (emphasis added). The "Whitestone rule" has been imported into Michigan law. Smith v. General Mtg. Corp., 402 Mich. 125, 261 N.W.2d 710, 712 (1978).

A recent Michigan case, Shoaff v. Estate of Baldwin, 2008 WL 2597553 (Mich. App. 2008) continues the Whitestone rule followed in Pulleyblank, Three Oaks, and Grella. In Shoaff, a judgment creditor held a judgment against DGM. DGM defaulted on a $130,000 mortgage it had given to a third party and that third party foreclosed the mortgage by advertisement. Shoaff (which held a judgment lien on the property which was junior to the foreclosed mortgage) was the buyer at the foreclosure sale, bidding $600,000 for the foreclosed property. Shoaff admitted "he overbid to dissuade others from bidding and to prevent redemption by the defendants." Shoaf, 2008 WL 2597553, at *1. This bid amount was $470,000 above foreclosed mortgage debt. Shoaff then claimed the property was worth only $500,000 and that he did not have to credit the DGM with the $470,000 surplus. The Michigan Court of Appeals backhanded Shoaff's argument, stating:

> We are at a loss to understand any logic behind plaintiff's [Shoaff] argument that defendants are not entitled to credit against the judgment for the surplus turned over to plaintiff. Even accepting, as we must given the procedural posture of this case, that plaintiff had priority to receive the surplus under MCL 600.3252 as the holder of a lien which encumbered the real estate sold at the foreclosure sale, *it necessarily follows that the debt secured by the [judgment] lien must be reduced by the amount of the surplus. We are unaware of anything in law, equity or logic that would support the conclusion that plaintiff is entitled to the surplus as a bonus and still seek recovery of the entire underlying debt.*

Shoaff, 2008 WL 2597553, at *2 (emphasis added).

16

As in Shoaff, the Bank must credit the full amount of its bid against the obligations owed to it by the Debtor.  As admitted by the Bank's own testimony, the amount it bid was equal the full amount the Debtor owed; therefore, the Bank has been paid in full.

The Michigan law is consonant with the mainstream of American jurisprudence. See, e.g., In re Spillman Dev. Group, Ltd., 401 B.R. 240, 253 (Bankr. W.D. Tex. 2009) (a credit bid is the equivalent of a cash purchase and if equal to the debt, will "prevent pursuit of additional collateral"); Titan Loan Inv. Fund, L.P. v. Marion Hotel Partners, L.L.C., 891 N.E.2d 74, 75 (Ind. Ct. App. 2008) (judgment creditor who bids in full debt at a foreclosure sale has been "fully paid and satisfied"); In re Oklahoma P.A.C. First Ltd. P'ship., 168 B.R. 212, 217-18 (Bankr. D. Ariz. 1993), aff'd, 174 B.R. 350 (B.A.P. 9th Cir. 1994) (mortgagee that bid its full debt at foreclosure sale has been paid in full, even if bid exceeds the fair market value of the property, and mortgagee may not pursue deficiency); 55 Am. Jur. 2d Mortgages § 524 (2009) (a creditor bidding the full amount of its debt at a foreclosure sale cannot subsequently claim the property was worth less and he must release the borrower from further obligations); 2 Law of Real Estate Financing § 12:84 (2009) (a mortgagee bidding the full amount of his debt at a foreclosure sale is prevented from pursuing additional collateral).

Even assuming arguendo that Wisconsin law applies, the Bank cites no Wisconsin authorities that would change the mainstream result.  Independent research shows Wisconsin law is equally clear; a party who overbids at a foreclosure sale will be held to its bid regardless of its unilateral mistake.  "One who overbids at a sheriff's sale through a unilateral mistake must bear the consequences."  Metropolitan Life Ins. Co. v.

17

Wilson, 220 Wis. 2d 355 (Table), 1998 WL 255046, at *3 (Wis. App. 1998).  "No reason exists for us to help the bank . . . . It chose to overbid.  We will not intervene if an overbid at a sheriff's sale results from the bidder's ignorance."  Horicon State Bank v. Kant Lumber Co., Inc., 165 Wis. 2d 543, 548, 478 N.W.2d 26, 28 (Wis. App. 1991).

C.    *Indebtedness Secured by the Foreclosed Mortgage.*

At prior hearings, the Bank presented sworn testimony that its loans were cross-collateralized by both the Wisconsin and Michigan properties. (Trans. at 197, Feb. 10, 2010.)  In its Proof of Claim dated July 21, 2010, the Bank states that its debt is secured by the total value of both the Wisconsin and Michigan properties.  However, in a legal memorandum filed September 1, 2010, and during the September 7, 2010 hearing, the Bank first alleged, contrary to its prior Proof of Claim, that its Note 1 (Exh. R) was *not* secured by the January 20, 2007 mortgage (Exh. U) and that, therefore, the foreclosure of that mortgage "has no bearing" on such note.  Even if the Bank is permitted to raise the issue notwithstanding its prior contradictory position, there is no effect on the legal outcome.

Assuming that the Bank is correct in its new (and seemingly manufactured) contention that the January 20, 2007 mortgage did not secure its Note 1, then by bidding in the total of *both* notes ($413,560.27) at the foreclosure sale, a surplus (equal to the amount of Note 1) was created.  That surplus must be credited to the benefit of, or otherwise paid to, the Debtor.

18

The Michigan Foreclosure by Advertisement statute governs the result.

> If after any sale of real estate . . . there shall remain . . . any surplus money after satisfying the mortgage . . . *the surplus shall be paid over . . . to the mortgagor . . . .*

Mich. Comp. Laws Ann. § 600.3252 (emphasis added).

In addition, the Bank's mortgage (as do all mortgages on Michigan real estate containing the power of nonjudicial sale) follows the statute:

> Lender [the Bank] may sell, release and convey the Real Property at public sale . . . *paying any surplus funds, after payment in full of the sums then due under this mortgage . . . to Grantor [the Debtor], all in accordance with applicable laws.*

Exh. M at 6 (emphasis added).

For over 100 years Michigan law has mandated that surplus proceeds from a foreclosure sale belong to the mortgagor.

> Surplus proceeds are to be paid over to the mortgagor . . . . Under the statutes, *surplus proceeds are to be paid over to the mortgagor, even though the mortgagee is the successful bidder. A mortgagee who bids on the property cannot escape liability to the mortgagor on the ground that he or she did more than was necessary.*

10A Michigan Pleading and Practice § 74:46 (Thomson Reuters, 2d ed. rev. 2010) (emphasis added); see, Kennedy v. Brown, 50 Mich. 336, 339-40, 15 N.W. 498, 500 (1883) (mortgagee who bid more than the debt secured by the mortgage "is not at liberty to repudiate a part of the bid as being fictitious;" and "[h]e made himself a debtor to the owner of the equity of the redemption for the amount"); Baxter's Estate v. Wilkinson, 97 Mich. 536, 538-39, 56 N.W. 931, 932

19

(1893) (the surplus "belonged to the owner of the equity of redemption"). The Bank does not, and is unable to, cite any contrary authority.[2]

The fact that the Bank improperly retained the overbid surplus, rather than paying it to the sheriff, does not save the Bank from the legal consequences.

> The fact that he [the mortgagee] kept the money instead of paying it to the sheriff, as was his legal duty, cannot help him. . . . [H]e is estopped from alleging his neglect to pay the sheriff as a reason for not being required to pay at all. According to the facts, *he should have paid to the sheriff for the benefit of the owner of the equity of redemption, and not having done so he holds the amount for the use of the plaintiffs.*

Kennedy, 50 Mich. at 339-40, 15 N.W. at 500 (emphasis added).

D.      *The "Turnip" Defense.*[3]

The Bank contends that *if* this had been a mortgage on Wisconsin real estate and *if* it had foreclosed that mortgage judicially in Wisconsin, *then*, perhaps, a Wisconsin court would have saved the Bank from its unilateral mistake of overbidding by finding that the "fair value" of the property exceeded the amount of the debt under a particular Wisconsin statute. Wis. Stat. Ann. § 846.165(2).

---

[2] As noted above, the issue of the effect of the Bank's bid at the foreclosure sale has been addressed not only in the current contested matter, but in numerous other filings by the Bank during this case. *Never* has the Bank cited any authority supporting its claim that it should be relieved from its "mistake." The Bank has been represented simultaneously by both Michigan and Wisconsin counsel throughout this bankruptcy. Yet, at the final argument on the Motion, its Wisconsin counsel stated: "Michigan has a statute . . . I'm not licensed in Michigan, but I understand there is a statute, I have seen the statute, and it talks about situations where mistakes are made in Michigan foreclosures. And that statute . . . consequently is available to this bank, should it have the opportunity to get to Michigan and try it." The Bank is in Michigan and this is its opportunity. Once again, the Bank does not cite this "mystery statute." Also, the court's comprehensive independent research has not found any authority or statute which supports the Bank's "mystery statute" or "mistake" argument.

[3] This subsection is a partial homage to Timothy J. Curtin, the self-styled "oldest emergency temporary federal law clerk in the United States."

The real estate is *not* in Wisconsin; it is in Michigan.  The foreclosure was *not* a judicial foreclosure in Wisconsin, but a non-judicial foreclosure in Michigan under the applicable Michigan statute.  Stating that if the facts were completely different, the legal result may be different is not a defense - it is nothing but an exercise in unwarranted fantasy.

The court has been reminded of an ancient adage "if turnips were watches, then beggars would tell time."  Well, turnips are not timepieces regardless of how much one might wish they were, and so they are useless for ascertaining the time.  The Bank's "turnip defense" is equally ineffective.

Even if this had been a Wisconsin foreclosure and governed by Wisconsin law, the Bank would lose.  Metropolitan Life Ins. Co., 1998 WL 255046, at *3 (one who makes a mistake and overbids at a foreclosure sale must bear the consequences); Horicon State Bank, 165 Wis. 2d at 548, 478 N.W.2d at 28 (a purchaser at a foreclosure sale is bound by its overbid, even if it is a unilateral mistake).

Finally, the Bank's contention that a Wisconsin court would have applied the Wisconsin statute to save it from its overbid is rejected.  The statute cited by the Bank states:

> In case the mortgaged premises *sell for less than the amount due on the mortgage debt* . . . there shall be no presumption that such premises sold for their fair value and no sale shall be confirmed and *judgment for deficiency rendered*, until the court is satisfied that the fair value of the premises sold has been credited on the mortgage debt . . . .

Wis. Stat. Ann. § 846.165(2) (emphasis added).  This statutory subsection only applies when the sale is for "*less*" than the mortgage debt.  Here, the entire dispute results because the Bank bid in its *entire* debt.  The Wisconsin statute is inapplicable.  Even

21

assuming the statutory subsection is applicable, the Wisconsin statutory provision is designed to protect the mortgagor, and not the mortgagee, from a deficiency judgment.

E.      *The Bank's Attack Upon Its Own Sale.*

As its last effort, the Bank seeks to attack its own sale; presumably it wants to invalidate it.   The Bank unilaterally decided to foreclose its Michigan mortgage.   It unilaterally conducted all aspects of the sale process.  It unilaterally decided to bid the full amount of its debt at the foreclosure sale.   The Bank took no steps whatsoever to set aside its Michigan Foreclosure Sale.  During the bankruptcy (following the expiration of the sixty-day extension of 11 U.S.C. § 108), the Bank asserted that it was the "rightful owner" of the foreclosed Michigan property.   It accepted the benefits of the foreclosure sale.  The Debtor was not involved in the foreclosure sale.  The Debtor did not induce any of the Bank's actions or decisions. The Bank now believes it paid too much for the property, and belatedly seeks to attack its own purchase by arguing that its own sale must be voided as contrary to Michigan law.  The Bank is not permitted to invalidate the sale.

The Bank argues that it violated Mich. Comp. Laws Ann. § 600.3204(1)(b) in conducting the sale because it had instituted, again unilaterally, a Wisconsin foreclosure action prior to the August 8, 2008 sale.  That section provides:

> (1) Subject to subsection (4), a party may foreclose a mortgage by advertisement if all of the following circumstances exist:
>
> . . .
>
> (b) An action or proceeding has not been instituted, *at law*, to recover the debt secured by the mortgage . . . or, if any action or proceeding has been instituted, the action or proceeding has been *discontinued . . . .*"

Mich. Comp. Laws Ann. § 600.3204(1)(b) (emphasis added).

22

First, the Bank cites no authority that its Wisconsin foreclosure action is a proceeding "at law," rather than an equitable action. However, the court's independent research reveals that a Wisconsin judicial foreclosure is *not* a proceeding "at law," but an equitable action. <u>Frick v. Howard</u>, 23 Wis. 2d 86, 96, 126 N.W.2d 619, 625 (1964) ("foreclosure of the mortgage is a proceeding in equity"). <u>See</u>, <u>e.g.</u>, <u>Mutual Fed. S & L Ass'n v. Wisconsin Wire Works</u>, 58 Wis. 2d 99, 110, 205 N.W.2d 762, 796 (1973); <u>Wisconsin Fin. Corp. v. Beilke</u>, 142 Wis. 2d 937, 417 N.W.2d 197, 1987 WL 29659, at *2 (Wis. Ct. App. 1987); <u>Bank One Wisconsin v. Kahl</u>, 258 Wis. 2d 937, 947-48, 655 N.W.2d 525, 530 (Wis. Ct. App. 2002) ("Subsection (1)(g) [of Wis. Stat. § 806.07] allows the court to grant relief based on its equitable powers, *and applies only to equitable actions. . . .* A mortgage foreclosure is an *equitable* proceeding.") (citations omitted) (emphasis added).

Second, the Bank received its Wisconsin foreclosure judgment by default on July 15, 2008, which is prior to the Michigan Foreclosure Sale on August 8, 2008. The Bank took no steps to enforce the judgment until it finally scheduled a foreclosure sale in August, 2009. The term "discontinued" is not defined in Mich. Comp. Laws Ann. § 600.3204(1)(b), but given its ordinary meaning, the Bank may have "discontinued" its Wisconsin action prior to its Michigan foreclosure sale.[4]

Third, Mich. Comp. Laws Ann. § 600.3204 is a provision which exists for the benefit of the *mortgagor* not for the benefit of the Bank, as mortgagee. As stated by the

---

[4] A dictionary defines "discontinue" as: (1) "to break continuity of: cease to operate, administer, use, produce, or take[;]" and (2) "to abandon or terminate by a legal discontinuance: to come to an end." <u>Merriam-Webster's Collegiate Dictionary</u> 331 (10th ed. 1999).

Michigan Supreme Court in interpreting identical language contained in the predecessor to § 600.3204, "[T]he whole object and intent of that provision is to *prevent the creditor* pursuing a double remedy at the same time, thus putting *the debtor* to needless costs and expense." Larzelere v. Starkweather, 38 Mich. 96, 1878 WL 3350, at *4 (emphasis added). "The purpose of this statute is to force [on the mortgagee] an election of remedies against the mortgagor." 10A Michigan Pleading and Practice § 74:25 (Thomson Reuters, 2d ed. rev. 2010). The Bank, as mortgagee, may not rely on Mich. Comp. Laws Ann. § 600.3204 which was enacted for the benefit of the mortgagor.

Fourth, the Bank is estopped from challenging its own sale. "It is well settled that a judgment creditor who receives the proceeds of an execution sale, or participates therein to the extent of receiving a definite benefit, in affirmation of the sale, is precluded from later challenging it for defects or irregularities not rendering it a legal nullity." H.D. Warren, Annotation, Estoppel of or Waiver by Parties or Participants Regarding Irregularities or Defects in Execution or Judicial Sale, 2 A.L.R. 2d 6, § 19 (1948). "Assumption of control or taking possession of property at an execution sale, by the judgment creditor as purchaser, has been held to constitute affirmation of the validity of the sale, through the application of the doctrine of estoppel and waiver . . . ." Id. at § 20.

> The conduct upon which waiver or estoppel may be predicated includes acquiescence, silence and inaction by a person having, or chargeable with, knowledge of the facts on which the challenge to the validity of the sale is grounded . . . [including] allowing the sale to proceed without objection, attending the sale but doing nothing to protect one's interests, accepting all steps taken in the proceeding, failing to file exception to the report of the officer conducting the sale . . . or on silence and inaction at successive stages of the proceedings.

47 Am. Jur. 2d Judicial Sales § 228 (2010).

24

The Bank not only failed to object to the sale, but was solely responsible for causing the sale. The Bank caused the sale to proceed and it was the sole participant in the sale as both seller and buyer. The Bank accepted all the steps of the process and took ownership of the property following the sale. Thereafter, the Bank failed to object to the sheriff's report of sale and had its own attorney prepare the deed and affidavit of the sheriff confirming the sale. (Exh. 1.)

Fifth, in Michigan, the party challenging a foreclosure based upon some defect in the process must show the "harm [to itself] was caused by the defect." Jackson Inv. Corp. v. Pittsfield Prods., Inc., 162 Mich. App. 750, 755-56, 412 N.W.2d 99, 101-02 (1987). Under these facts, no harm was caused to the Bank by reason of any possible violation of Mich. Comp. Laws Ann. § 600.3204. If there was any harm, it was to the Debtor. Additionally, if a party is to attack a statutory foreclosure in Michigan, it must act without delay. In Jackson, a delay of five months between the sale and the complaint attacking the sale was determined to be untimely. Id. at 756, 413 N.W.2d at 102. Similarly, another court rejected an attack on a Michigan mortgage sale noting the "Plaintiff let several [six] months pass after the foreclosure sale before filing a complaint." Worthy v. World Wide Fin. Servs., Inc., 347 F.Supp. 2d 502, 511 (E.D. Mich. 2004), aff'd, 192 Fed.Appx. 369, 2006 WL 21889 (6th Cir. 2006). Here, the Bank never filed a complaint to attack its sale during the full year between the foreclosure sale and the filing of the Debtor's bankruptcy case. Because of the passage of time, the Bank is prohibited from now attacking the Michigan Foreclosure Judgment.

Sixth, and finally, absent a showing of fraud, Michigan prohibits judicial attacks upon Michigan statutory foreclosures.

25

> Michigan courts have long held that statutory foreclosures should not be set aside without very good reason and, thus, have placed the burden of proof upon the party who attempts to impeach them. The Michigan Supreme Court has held that it would require a strong case of fraud or irregularity, or some peculiar exigency, to warrant setting a foreclosure sale aside.

United States v. Garno, 974 F.Supp. 628, 633 (E.D. Mich. 1997) (citing numerous Michigan cases); see also, Corgan v. Deutsche Bank  Nat'l. Trust Co., 2010 WL 2854421, at *3 (W.D. Mich. 2010) (same).  If there was any fraud in this case (a problematic assertion), it was not fraud committed by the Debtor.  Any asserted fraud may be that of the Bank by its playing "fast and loose" with the Michigan foreclosure process and its aftermath.  After filing its Wisconsin foreclosure action, the Bank published repeated Notices of Foreclosure in Michigan stating "no legal or equitable proceedings have been instituted to recover the debt secured by the mortgage" and, following the sale, recorded the deed prepared by its attorney with the foreclosure notice containing the same inaccurate statement.  (Exhs. 1, V, W, X, and Y.)  This is certainly not the type of "very good reason" that permits the Bank to belatedly seek to avoid the consequences of its own sale.

F.     Summary.

In accordance with the court's findings of fact and the conclusions of law, the Debtor owes the Bank nothing, i.e. zero dollars and zero cents.

The Bank has requested permission to continue the pending Wisconsin foreclosure action to collect its asserted remaining indebtedness.  Because the Bank is owed no remaining debt, there is no reason to continue the foreclosure regarding the Wisconsin property (except to dismiss the action).  The court grants extremely limited relief from stay solely to permit the Bank to *dismiss with prejudice* the Wisconsin

foreclosure lawsuit.  If the Bank fails to dismiss the Wisconsin foreclosure action within a short time (deemed to be twenty-one days) after this court's attendant order becomes final and non-appealable, the Debtor may return to this court to seek appropriate relief, only to the extent necessary.

The Bank has objected to the Debtor's Plan.  However, because the Debtor owes the Bank nothing, the Bank does not hold a "debt" or a "claim" against the Debtor.  11 U.S.C. § 101(5)(A).  Although the court previously determined the Bank had provisional standing in its venue decision, Miller, 433 B.R. at 207, based upon this opinion, the court now determines that the Bank lacks standing to object to the Debtor's Plan.  The Bank now has no "claim" because it has no pecuniary interest at stake in this chapter 13 case.

Although the Bank's objection to confirmation is denied, the court will not now confirm the Debtor's Plan.  A confirmation hearing will be scheduled and the court will carefully review the Plan to ascertain that it complies with all Bankruptcy Code requirements. Cf. United Student Aid Funds, Inc. v. Espinosa, ___ U.S. ___, ___, 130 S.Ct. 1367, 1381, n.14 (2010) (bankruptcy courts should make independent determinations regarding whether a chapter 13 plan complies with confirmation standards under the Bankruptcy Code; "Section 1325(a) . . . *requires* bankruptcy courts to address and correct a defect in a debtor's proposed plan even if no creditor raises the issue.") (emphasis added).

## V. CONCLUSION.

The Bank bid in the entire amount of its indebtedness at the Michigan Foreclosure Sale to purchase the 3-40 Acre Parcels which it now owns.  The Debtor

27

now owes the Bank nothing, i.e. zero dollars and zero cents. The Bank's motion for relief from stay to continue a separate Wisconsin foreclosure action regarding other real property is denied except to require the Bank to dismiss the Wisconsin foreclosure with prejudice. The Bank's objection to confirmation of the Debtor's Plan is also denied. The court will schedule an adjourned confirmation hearing to consider confirmation of the Debtor's Plan.

A separate order shall be entered accordingly.

Honorable James D. Gregg
Chief United States Bankruptcy Judge

Dated this _13_ day of
January, 2011
at Grand Rapids, Michigan